IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

01 FEB 22 PM 4: 20

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              CIV. No. 98-1359 JP/LFG

PAUL K. BYERS,

        Defendant,

and CANONCITO BAND OF NAVAJOS,

        Intervenor-Defendant

**INTERVENOR-DEFENDANT'S PROPOSED FINDINGS OF FACTS/CONCLUSIONS OF LAW**

## FINDINGS OF FACT
## INTERVENOR-DEFENDANT CANONCITO BAND OF NAVAJOS

1. The United States of America filed the original complaint in this action against Defendant Paul Byers, to enjoin the unlawful inclosure of public lands and interference with access to public lands by Defendant Byers, and for trespass on the part of Defendant Byers.

2. This Court has jurisdiction over this matter under 28 U.S.C. Sec. 135, and 43 U.S.C. Sec. 1062. Venue lies in this district pursuant to 28 U.S.C. Sec. 1391(b).

3. Traditional members of the Canoncito Band of Navajos (hereinafter 'CBN') intervened as Defendants in this action in order to protect their interest in sensitive cultural resources in the area, pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure.

4. In their answer in intervention, the CBN filed a crossclaim against Defendant Paul Byers which falls within the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. Sec. 1367 (a).

5. The CBN's crossclaim seeks to establish the right to cross over and upon the private land of Defendant Byers, by way of prescriptive easement, in order for the CBN to make its historic pilgrammages to sacred sites located on Byers' land as well as the nearby public lands and to access traditional cultural and natural resources.

6. Defendant Paul Byers is a resident of the State of New Mexico, and is within the jurisdiction of this Court.

7. Defendant Paul Byers, upon information and belief, is the owner of the following described private lands, located within Sandoval County: S1/2N1/2, N1/2SE1/4, SW1/4SE1/4, NE1/4SW1/4 of Section 20, T. 15 N, R. 3 W., N.M.P.M. Also, NE1/4 of Section 30, T.15 N., R. 3 W., N.M.P.M.

8. The United States of America, upon information and belief, is the owner of the following described public lands, located within Sandoval County: W1/2SW1/4, SE1/4SW1/4, SE1/4SE1/4 of Section 20, T.15 N, R.3 W., N.M.P.M. Also, Section 19, T.15 N., R. 3 W., N.M.P.M. Also, Section 21, T. 15 N., R. 3 W, N.M.P.M. Also, Section 29, T. 15 N., R. 3 W., N.M.P.M. Also, Section 25, T.15 N., R. 4 W., N.M.P.M. Also, N1/2N1/2 of Section 36, T. 15 N., R. 4 W., N.M.P.M. Also, Section 26, T. 15 N, R. 4 W (Forest

Service Land).

9. The Big Bead Mesa and surrounding area included in the public and private lands located in Sections 19, 20, 21, 29 and 30 of T.15 N, R. 3 W, and Sections 25 and 26 of T.15 N, R. 4 W., N.M.P.M. comprise the ancestral homeland of the CBN.

10. The CBN consider this area to be the home of their Holy People.

11. The CBN are the only Indian group who consider this area to be their ancestral homeland and who have continuously used this area as their exclusive place of worship.

12. This area is very sacred to the CBN and is considered to be the central to the CBN's existence and vital to the preservation of their culture.

13. Numerous cultural, botanic, religious, and archaeological resources used historically by the CBN and their ancestors for traditional cultural and religious purposes are found in this area.

14. Archaeological remains built by the ancestors of the CBN and dating back more than two hundred years are located within the above described public and private lands.

15. Rock art created by the ancestors of the CBN is located within the above described public and private lands.

16. The ancestors of the CBN have conducted sacred ceremonies and engaged in other traditional cultural practices in this area for generations.

17. One of the largest and most important ceremonies of the CBN is conducted in the month of October, which is the beginning of the Navajo New Year.

18. The CBN engages in other traditional cultural practices during the months of November, December, March, and June.

19. Today, the CBN lives in a community known as 'Tohajiilee' (formerly 'Canoncito'), located approximately thirty miles west of Albuquerque and forty miles directly south of the above described public and private lands.

20. Traditional members of the CBN must now travel to their ancestral homeland several times each year in order to engage in their historic religious and traditional cultural practices.

21. At times, the CBN are accompanied on their pilgrimmages by non-members of the CBN,

who are present for a variety of purposes such as educational, professional, labor, etc.

22. For many years after migrating to their current location, the CBN traveled directly north to their ancestral homeland, usually on horseback.

23. Fencing, locked gates, and deteriorated road conditions eventually rendered this route impossible.

24. The CBN was eventually forced to travel by automobile, east to Albuquerque, north to Highway 44, and east for many more miles before reaching dirt roads, quite rough in many spots, upon which they travel for approximately one and one-half hours before reaching the sacred area.

25. Big Bead Mesa is considered by the CBN to be the most sacred area of the ancestral homeland and is an important site for CBN's ceremonies and worship.

26. The Big Bead Mesa is located in Sections 25 and 26, T. 15 N, R. 4 W, which land is owned by the United States of America.

27. There are thirteen specific sites found on Big Bead Mesa which are sacred to the CBN.

28. Archaeological evidence on Big Bead Mesa is exclusively Navajo.

29. The CBN is the only Indian group who uses this site exclusively as the center of their religious practices.

30. The only roadway which provides access to Big Bead Mesa is the Banco de la Casa road, which passes through the private land of Defendant Paul Byers in Sections 20 and 30, T. 15 N., R. 3 W, N.M.P.M.

31. Otherwise, Big Bead Mesa is completely landlocked and inaccessible by vehicle.

32. Since the mid 1980's, the CBN have traveled over this roadway and through the private land of Defendant Paul Byers in Sections 20 and 30, T. 15 N., R. 3 W, N.M.P.M. in order to make their annual sacred pilgrimmage and engage in other traditional cultural practices.

33. Beginning in the mid to late 90's Defendant Byers began locking cattle gates, both on his private property as well as the public lands through which the roadway ran, thus impeding the easy passage of the CBN through the portion of roadway that ran through Section 20, T. 15 N. R. 3 W of Defendant Byers' property.

34. The leaders of the CBN dismantled the gates and found other ways to pass through them

    whenever possible, in order to continue engaging in other traditional cultural purposes.

35. Passage through the portion of roadway passing through Section 30, T.15 N., R. 3 W. of Defendant Byers' property was not impeded.

36. However, while the CBN had previously enjoyed an amicable relationship with Defendant Byers as well as with his parents during there lifetimes, their relationship with Defendant Byers began to erode during the years 1998, 1999, and 2000.

37. This deterioration was due in part to hostilities Defendant Byers exhibited toward agents of the BLM, who had passed through Defendant Byers' property for administrative purposes for many years and who had begun experiencing difficulty with their own passage subsequent to the death of Defendant Byers' parents in the early 1990's.

38. The deterioration in the relationship between the CBN and Byers was also due to Defendant Byers' agitation over the large number of people who made the pilgrimmage with the CBN in 1999, many of whom were Indian guests of the CBN from other states and countries.

39. At that time, Defendant Byers indicated to one of the leaders of the CBN group that violence would result if the CBN and their guests attempted to make the pilgrimmage.

40. Upon information and belief, Defendant Byers was also involved in hostilities with his neighbors and others, who reported armed encounters with Defendant Byers.

41. As matters escalated between Defendant Byers and the BLM during 1998, 1999, and 2000, Defendant Byers' behavior became more erratic and at times included perceived threats to the safety of others, including BLM agents, neighboring ranchers and the CBN.

42. The leaders and elders of the CBN became more concerned and apprehensive about the safe passage of the larger group and the compromise in spiritual integrity which the conflict might cause during the times of the sacred pilgrimmage.

43. Uncertain what to do, and without funds to retain counsel, some members of the CBN attempted to make the annual pilgrimmage to Big Bead Mesa on foot over seven miles of very rough terrain, avoiding Section 20 of Defendant Byers' property, while the CBN leaders continued to use the roadway easement at other times. Some of the elders, children and others who were physically unable to make the journey were left behind at

camp and could not make their sacred pilgrimmage.

44. The CBN's travel upon the roadway through Defendant Byers' property has been open.

45. The CBN's travel upon the roadway through Defendant Byers' property has notorious.

46. The CBN's travel upon the roadway through Defendant Byers' property has been uninterrupted, in that it has taken place routinely at roughly the same times each year.

47. The CBN's travel upon the roadway through Defendant Byers' property has been peaceable.

48. The CBN's travel upon the roadway through Defendant Byers' property has been adverse to Defendant Byers' ownership and rights.

49. The CBN's travel upon the roadway through Defendant Byers' property has been under a claim of right.

50. The CBN's travel upon the roadway through Defendant Byers' property has been continued for a period in excess of ten years.

51. The CBN's travel upon the roadway through Defendant Byers' property has taken place with the knowledge or imputed knowledge of Defendant Byers as the roadway passes his home, and the Defendant Byers home easily affords him a view of the CBN's campsite and many sacred sites which the CBN visit during the same time period.

52. The CBN's travel upon the roadway through Defendant Byers' property has taken place with the knowledge or imputed knowledge of Defendant Byers, who occasionally visits with the CBN at their campsite during the time of their pilgrimmage.

53. The CBN's travel upon the roadway through Defendant Byers' property has taken place with the knowledge or imputed knowledge of Defendant Byers' parents who lived in the same home as Defendant Byers at the time of the onset of the CBN's use of the roadway during the early years of the prescriptive time period, until 1993, by which time they had passed away.

54. Neither Defendant Byers nor his parents made a formal arrangement with the CBN expressly granting the Band permission to cross their private lands, as described above.

55. The CBN's travel over the roadway requires an easement measuring the length of the roadway over Defendant Byers' property in both Sections 20 and 30, T. 15 N., R.3 W.

and the width of the roadway.

56. Without the use of the roadway, the CBN would have to walk more than seven miles to Big Bead Mesa from their campsite.

57. The terrain between the campsite and Big Bead Mesa is very rough and the journey can not be made by some elders, children or anyone not physically fit for such activity.

58. One of the sacred sites at which the CBN worships and engages in traditional cultural practices during their pilgrimmage and at other times shown on the attached schedule is a rock art or petroglyph wall located in a section of Canon Tapia which runs through the southern portion of Defendant Byers' private property (SW1/4SE1/4, Section 20 T. 15 N., R. 3 W., N.M.P.M.).

59. The CBN is the only Indian group who uses this site exclusively as a place of worship.

60. The CBN and its ancestors has engaged in such practices for more than two hundred years.

61. This area is known as the 'animal offering' petroglyph.

62. The CBN has historically accessed the animal offering petroglyph area on Defendant Byers' private land by walking across Canon Tapia and crossing over the southern boundary of Defendant Byers' land, in the SW1/4SE1/4, T. 15 N., R. 3 W., N.M.P.M.

63. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has been open.

64. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has been notorious, and many neighboring ranchers are well aware of the CBN's pilgrimmage.

65. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has been uninterrupted, in that it has taken place routinely at the same time each year.

66. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has been peaceable.

67. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has been adverse.

68. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has been under a claim of right.

69. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has been continued for a period well in excess of ten years.

70. The CBN's travel across the southernmost area of Defendant Byers' private land and use of the animal offering petroglyph area has taken place with the knowledge or imputed knowledge of Defendant Byers, who can view the CBN's campsite and trek from his home.

71. Neither Defendant Byers nor his parents who lived in the same home in Section 20, T.15 N., R. 3 W., N.M.P.M. for many years prior to their deaths and during the prescriptive time period when the CBN accessed the animal offering petroglyph made a formal arrangement with the CBN expressly granting the Band permission to cross their private land in order to access and engage in traditional religious and cultural practices at the relevant petroglyphs.

72. The actual dimensions of the easement required to access the petroglyphs are difficult to calculate as the journey takes place and the petroglyph wall is located within a canyon.

73. The CBN requires use of the entire canyon floor from the southern boundary of Defendant Byers' property to an area slightly north of the petroglyph section, as well as ledges or paths allowing the Band members access to the actual rock art.

74. The CBN cross Defendant Byers' private land to access Big Bead Mesa under a claim of right given to them by their Holy People, in order to worship and engage in traditional cultural practices at Big Bead Mesa, which is essential to the preservation of their religion and culture.

75. The CBN cross the southernmost portion of Defendant Byers' private land under a claim of right given to them by their Holy People, in order to access their animal offering petroglyphs and to worship and engage in traditional cultural practices, which is essential to the preservation of their religion and culture.

76. The lands in these relevant areas belonged to the Navajos at one time, and were

specifically occupied and settled by the ancestors of the CBN, until the larger tribe sold the lands to the government and failed to compensate the CBN.

77. The CBN have used both the roadway and canyon easements under a claim of right stemming from this prior ownership and the transaction which took place between the larger tribe and the United States government without the consent of the CBN

78. The CBN use both easements under a claim of right stemming from the religious freedom afforded them by the Free Exercise Clause of the Constitution, as well as the rights acquired through the American Indian Religious Freedom Act and other federal laws, without which right their freedom to worship would be meaningless.

79. The relationship between Defendant Byers and the CBN has been stormy and inconsistent at times, and is becomming increasingly hostile and the continued safe passage of the CBN over Defendant Byers' land is thus uncertain each time.

80. The CBN needs to make a formal and permanent arrangment in order to guarantee their ability to access Bead Bead Mesa and the animal offering petroglyphs safely and with assurance, as their ability to worship and engage in traditional cultural practices at these sites is vital to the preservation of their culture.

81. Defendant Paul Byers has provided no information for the pretrial order with regard to the claims of the CBN.

82. Defendant Paul Byers has not responded to requests by CBN's counsel for an interview, nor provided same counsel with any information reasonably calculated to facilitate preparation for trial and has been generally uncooperative.

## Schedule of Use by CBN
## Big Bead Mesa and Surrounding Area

| **Date** | **Purpose** | **Number of People** |
| --- | --- | --- |
| Annually, 9/15-10/15 One week period | Annual Ceremony/pilgrimmage | Eighty or less |
| Annually, 9/15-10/15 | Preparation/cleanup | Eight people or less |
| November (date to be determined each year/ climate dependent) | Ceremonial/offerings/maintenance | Two-three people |
| December 15-31 | Ceremonial/offerings/maintenance | Two-three people |
| March 1-15 | Ceremonial/offerings/maintenance | Two-three people |
| June 20-30 | Ceremonial/offerings/maintenance | Two-three people |
| Varies | Emergencies | |

## CONCLUSIONS OF LAW
## INTERVENOR-DEFENDANT CANONCITO BAND OF NAVAJOS

1.  Title to an easement can be acquired by prescription. (Vigil v. Baltzley, 79 N.M. 659, 660, 448 P.2d 171, 172 (1968), citing Hester v. Sawyers, 41 N.M. 497, 71 P.2d 646, 652 (1937)).

2.  "A prescriptive right is obtained by use alone and does not depend upon any statute." (Hester v. Sawyers at 503).

3.  A prescriptive right is "founded upon the presumption of a grant, though there may never have been one." (Id.)

4.  "[T]he period of use necessary to create an easement by prescription is ten years, following our statute of limitations with reference to adverse possession...." Id.

5.  In order for a trial court to find a prescriptive easement, the claimant "must show that he acquired the easement by a use which was "open, uninterrupted, peaceable, notorious, adverse, under a claim of right and continued for a period of ten years with the knowledge or imputed knowledge of the owner." (Silverstein v. Byers, 114 N.M. 745, 747 845 P.2d 839, 841 (Ct.App. 1962), citing Hester v. Sawyers at 504. See also Matsu v. Chavez, 96 N.M. 775, 778, 635 P.2d 584, 587 (1981).)

6.  Two or more required elements may be "analyzed in conjunction with each other." (United States v. Earl Platt, 730 F.Supp. 318, 321, 322 (1990).)

7.  "To be open and notorious, the use must be of such a nature as to charge the landowner with constructive notice." (Silverstein v. Byers at 842, citing Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land, Sec. 5.04 (1988 & Supp. II 1991).)

8.  "The landowner need not have actual knowledge of the adverse usage. Rather, the claimant must prove that the use was sufficiently open and notorious to apprise a diligent owner of its existence." (The Law of Easements and Licenses in Land, Sec.5.04.)

9.  "It is only the use to which the premises are put which must be shown to be adverse, open and notorious. To the extent that the use is established, it, of course, is hostile to the title of the servient estate." (United States v. Earl Platt at 321.)

10. While an Indian group making a pilgrimmage to their holy grounds may regard their specific activity as personal and private, this does not negate the elements of 'open' and

'notorious' which must be shown by their use of the claimed prescriptive easement, where their use of such easement was not hidden from the community, and was generally known to the community. (See United States v. Earl Platt at 322.)

11.   The requirement of adversity is met for purposes of a prescriptive easement merely by a showing that the use of another's land is wrongful or without regard for the owner's rights. (The Law of Easements and Licenses in Land, Sec. 5.03(1)).

12.   "The great weight of the decisions hold that proof of an open, notorious, continuous and uninterrupted use for the prescriptive period, without evidence of how it began, raises a presumption that the use was adverse and under a claim of right." (Sanchez v. Dale Bellamah Homes of New Mexico, Inc., 76 N.M. 526, 529, 417 P.2d 25, 28 (1996). See also, Matsu v. Chavez at 779.)

13.   "[T]he presumption of a grant of the right is conclusive upon the passage of ten years of open, uninterrupted, peaceable, notorious and adverse use under a claim of right with knowledge or imputed knowledge of the owner." (Vigil v. Baltzley at 660. See also Sanchez v. Dale Bellamah Homes of New Mexico, Inc., at 529.)

14.   It is presumed that there is a claim of right, where there is no evidence presented in a case to rebut such presumption. (Matsu v. Chavez at 779.)

15.   A claim of right need not be formally asserted in establishing a prescriptive easement. (The Law of Easements and Licenses, Sec. 5.03(1).)

16.   A 'claim of right' to use the land of another temporarily or periodically may be shown by such conduct as pulling down fences which obstruct the user's path, and the lack of deviation from the regular route. (See United States v. Earl Platt at 323.)

17.   Failure to seek permission of the landowner in seeking to cross his or her lands is evidence of use under a claim of right. (Id.)

18.   The existence of a gate does not prevent a showing of adverse use, nor does providing keys to a locked gate "prevent the finding of an adverse use under a claim of right." (Silverstein v. Byers at 842.)

19.   "[I]n the absence of proof of express permission, the general rule is that the use will be presumed to be adverse under claim of right." (Silverstein v. Byers at 842, citing Village of

Capitan v. Kaywood, 96 N.M. 24, 525, 632 P.2d 1162, 1163 (1981); Sanchez v. Dale Bellamah Homes of New Mexico, Inc.; Castillo v. Tabet Lumber Co., 7 N.M. 492, 406 P.2d 361 (1965); Hester v. Sawyers.)

20. Where the user is "open, adverse, notorious, peaceable, and uninterrupted, the owner is charged with knowledge of such user, and acquiescence in it is implied." (Hester v. Sawyers at 504.)

21. The burden is on the "landowner to show that the use was permissive." (The Law of Easements and Licenses at Sec. 5.02(2).)

22. "[A]bsence of objection by a landowner to use of the landowner's property by a claimant does not constitute permission." (Id. at Sec. 5.03(2).)

23. In order for the claimant of a prescriptive easement to satisfy the elements of uninterrupted use which has continued for the statutory period, the claimant must demonstrate a "settled course of conduct" in his or her use within the frequency or necessity required by the nature of the use which is not interrupted by an actual physical interference with the claimant's use. (See The Law of Easements and Licenses, Sec.5.05(1)(2).)

24. Successive uses of the easement by various persons "may be tacked, or added together, to satisfy the prescriptive period...when the successive adverse users are in privity of estate." (Id. At 5.06(2).)

25. The exclusivity component to the acquirement of an easement by prescription means "simply that the individual right shall not depend for its enjoyment upon a similar right in others, being, by virtue of some distinction of its own, independent of all others." (Castillo v. Tabet Lumber Company at 496.)

26. Exclusivity "does not mean that the claimant shall have been the sole user, or the only one who could or might enjoy the same or a similar right over the same land...." (Id.).

27. An Indian group making a religious pilgrimmage across the private land of another need only establish that they have met the requirements necessary to establish an easement by prescription, in order to be granted such an easement by court. A court may grant such an easement without basing its decision on proof of religious rights to the land in question. (See United States v. Earl Platt at 324.)

28.     "Necessity is not an element in proving a prescriptive easement." (Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land, Sec. 5.02(2)(1988).

29.     The claimant's "burden of proof must be measured in terms of the right to the use they claim," such as a "very limited periodic use." The proof required is not the same as that necessary "to establish a claim of title by adverse possession." (United States v. Earl Platt at 322.)

30.     In the present case, this Court has jurisdiction over the subject matter and the parties.

31.     The CBN has established by clear and convincing evidence that their historic use of the roadway over and upon Defendant Byers' private property meets the necessary requirements as determined by common law and case law for the statutory period of ten years, to establish a prescriptive easement in the state of New Mexico upon such roadway.

32.     Namely, the CBN's use of the roadway during the required statutory period was sufficiently open and notorious and of such a nature as to charge Defendant Byers with constructive notice of their use of the roadway, if not actual notice, as the CBN's use was not hidden or secretive and was visible to all who would care to see. Neighboring ranchers as well as the BLM were aware of their use.

33.     Defendant Byers' failure to object to the CBN's use of the roadway does not constitute permission.

34.     The CBN's use of the roadway was also uninterrupted during the required statutory period, as evidenced by their settled course of conduct during that period, in traveling this same path routinely at the time of their ceremonies and other traditional practices.

35.     Further, the CBN's use of the roadway during the required statutory period was made under a claim of right, as evidenced by their failure to seek formal permission from Defendant Byers', their absence of deviation from their regular route during the prescribed statutory period, and the absence of proof to rebut such presumption.

36.     The CBN's deviation from their established route through Section 20 of Defendant Byers' property, during the time of the annual pilgrimmage and subsequent to their prior eleven years of continuous, uninterrupted and settled use, does not constitute an abandonment of the easement as such change was made temporarily out of concern for the elders and in an effort to avoid the tensions which would compromise the sacredness of the pilgrimmage.

37. This is particularly true, because the leaders of the CBN continued to use the roadway easement personally in 1998, 1999, and 2000 in order to access Big Bead Mesa for the purpose of engaging in other traditional cultural activies.

38. Moreover, this temporary avoidance of the roadway only during the time of the pilgrimmage was initially based upon a decision of the leaders of the CBN, who were aware of the ongoing litigation between the BLM and Byers, and who believed that resolution of the litigation would eliminate the hostilities and safety concerns thereby allowing the group to resume passage.

39. Subsequently, CBN was able to find counsel and entered the litigation in order to resolve their own concerns about use of the roadway and thereby formally establish an easement.

40. The CBN's use of the roadway during the required statutory period was adverse, as it was undertaken without legal right to enter Defendant Byers' property and without regard for such rights and there is no evidence on the record to rebut the presumption of adverse use.

41. Finally, the CBN's use of the roadway during the required statutory period met the requirement of 'peaceable use', as their travel over Defendant Byers' property was made without force, property damage or other disruption.

42. The CBN's use of the roadway durig the required statutory period over and upon Defendant Byers' property is not inconsistent with the exclusivity requirement which attaches to prescriptive rights to an easement.

43. Specifically, their use is distinguished from that of the Silversteins, who were granted a prescriptive easement over the roadway in order to access their property.

44. The CBN has no other reasonable means of accessing the Big Bead Mesa for the uses described, other than the roadway upon and across Defendant Byers' private property.

45. The CBN's burden of proof in establishing that they have met the requirements for obtaining a prescriptive easement must be measured in terms of the right to the use they claim, which in this case is the limited periodic use of attending to their traditional cultural purposes at Big Bead Mesa and the surrounding area in keeping with the long standing tradition of their ancestors.

46. The CBN has established by clear and convincing evidence that their historic use of the path at the southernmost boundary of Defendant Byers' property, through Canon Tapia and to the

animal offering petroglyphs, also on his property, met the necessary requirements as determined by common law and case law for the statutory period of ten years, to establish a perscriptive easement in the state of New Mexico.

47. Namely, the CBN's use of the path through Canon Tapia, beginning at the southernmost boundary of Defendant Byers' property and leading to the animal offering petroglyphs, also on his property, was sufficiently open and notorious and of such a nature as to charge Defendant Byers with constructive notice of their use of this path, if not actual notice.

48. Defendant Byers' failure to object to the CBN's use of the path through his property and use of the animal offerings petroglyph does not constitute permission.

49. The CBN's use of the path through Canon Tapia on Defendant Byers' property was also uninterrupted during the prescribed period, as evidenced by their settled course of conduct in traveling this same path routinely each year at the times of their ceremonial and traditional uses, having encountered no interference with their use during the prescribed period, and having engaged in no deviation during the prescribed period.

50. Further, the CBN's use of the path through Canon Tapia on Defendant Byers' property is made under a claim of right, as evidenced by their failure to seek formal permission from Defendant Byers', their absence of deviation from their regular route, and the absence of proof to rebut such presumption.

51. In addition, the CBN's use of the path through Canon Tapia on Defendant Byers' property was adverse, as it was undertaken without legal right to enter Defendant Byers' property and without regard for such rights and there is no evidence on the record to rebut the presumption of adverse use.

52. Finally, the CBN's use of the path through Canon Tapia on Defendant Byers' property met the requirement of 'peaceable use', as their travel was made without force, property damage or other disruption.

53. There is no proof on the record that CBN's use of the roadway over and upon both parcels of Defendant Byers' property, as well as the path through Canon Tapia beginning at the southernmost boundary of Defendant Byers' Section 20 property and ending at the animal offerings petroglyph was anything but open, notorious, uninterrupted, adverse and under a claim

of right, peaceable and undertaken continuously for a period of ten or more years.

54.  Therefore, it is ordered that the CBN are granted a prescriptive easement over and upon the roadway through Defendant Byers' property in Sections 20 and 30, T. 15 N, R. 3 W., in order to access the Big Bead Mesa for the CBN's traditional cultural purposes.

55.  It is further ordered that the CBN are granted a prescriptive easement over and upon the path through Canon Tapia, beginning at the southernmost portion of Defendant Byers' property in Section 20, T. 15 N., R. 3 W., and ending slightly north of the animal offerings petroglyphs on Defendant Byers' property, in order to engage in their traditional cultural purposes. This easement includes ledges or paths in the Canon wall utilized to access the rock art.

Respectfully submitted,

*/s/ Katherine P. LeBlanc*
Katherine P. LeBlanc
Attorney for Canoncito Band of Navajo Indians

I hereby certify that I have served a copy
of this pleading to John Zavitz, Assistant U.S.
Attorney, and defendant pro se Paul Byers,
on February 15, 2001.

Katherine P. LeBlanc