IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )      CIV. 98-1359 JP/LFG
                               )
        v.                     )
                               )
PAUL BYERS,                    )      MEMORANDUM OPINION
                               )
              Defendant,       )
                               )
CANONCITO BAND OF NAVAJO       )
INDIANS,                       )
                               )
        Intervenor-Defendant.  )
                               )

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

01 MAR 27 PM 1: 06

ALBUQUERQUE

This matter was tried to the Court on February 23 and
26, 2001.  The Court has considered the pleadings, trial
testimony, and exhibits.  Pursuant to Rule 52 of the Federal
Rules of Civil Procedure, the Court makes the following findings
of fact and conclusions of law:

## I.  FINDINGS OF FACT

The United States of America (United States or
Government) is the plaintiff in this case.  The Bureau of Land
Management (BLM) is an agency within the U.S. Department of the
Interior.  The BLM is responsible for administering over the
following public lands in Sandoval County, New Mexico (Township
15 North, Range 3 West):

> W1/2SW1/4, SE1/4SW1/4 of Section 20, T. 15
> N., R. 3 W., N.M.P.M.
>
> Section 19, T. 15 N., R. 3 W., N.M.P.M.



Section 25, T. 15 N., R. 4 W., N.M.P.M.
N1/2N1/2 of Section 36, T. 15 N., R. 4 W.,
N.M.P.M.

Bureau of Land Management employees visit these lands several times a year in order to administer over natural resources and monitor permitted uses. The public lands in Sandoval County are rich with archaeological artifacts, and the BLM monitors several locations that are sacred to the Canoncito Band of the Navajo Tribe for cultural and religious reasons.

Rugged terrain limits access to the public lands in Sandoval County. Traveling by land is time-consuming and difficult. The BLM will sometimes travel by helicopter. Most often, however, the BLM must travel by land. To reach the public lands, it uses a road the parties and witnesses in this case refer to as the "Banco de la Casa Road". The road is unpaved and ten (10) to twelve (12) feet wide. It branches off the county road near Guadalupe in Section 16 and extends in a southwesterly direction. It passes over state land, federal public land, private property and eventually becomes impassable and terminates in the Cibola National Forest (in Section 35).

The Banco de la Casa Road passes over Paul Byers' property in Sections 20 (Section 20 road) and 30 (Section 30 road). Byers is the defendant in this case. He owns the following properties in Sandoval County, New Mexico:

S1/2N1/2, N1/2SE1/4, SW1/4SE1/4, NE1/4SW1/4
of Section 20, T. 15 N., R. 3 W., N.M.P.M.

NE1/4 of Section 30, T. 15 N., R. 4 W.,
N.M.P.M.

The property in Section 20 was originally patented to Juan Jose Griego in 1922.  In 1942, the United States Department of Interior Grazing Service authorized Mr. Griego to use adjacent public lands for grazing.  In addition, he was granted a permit to construct and maintain fence around the grazing allotment.  A portion of this fence extends along the northern boundary of Section 20 (Section 20 fence).

William and Charlotte Byers, the defendant's parents, purchased the Griego property in 1977.  They were also assigned the permit to construct and maintain the Section 20 fence.  Paul Byers took title to the Section 20 property in 1992.  In 1998 he acquired title to the Section 30 property.

The Banco de la Casa Road was apparent to Byers' parents when they purchased Section 20 in 1977.  It was also visible to Byers when he took title to Section 20 in 1992.  Furthermore, the Section 30 road was visible to Paul Byers when he acquired title to the property.

The road passes through the Section 20 fence before entering Byers' property.  A gate was constructed where the road and fence intersect (Section 20 gate).  This gate has been in place since Mr. Griego was issued the permit to build the fence in 1942.  The Section 20 fence and Section 20 gate are located

-3-

entirely on public land.  Byers' property begins approximately
one-quarter mile south of the fence.

Township maps, topographical maps, and transportation
maps indicate the road has been in existence for more than fifty
(50) years and has followed the same course over time.
Government's Exhibit 2 is an excerpt from a BLM survey conducted
from May 7, 1934, to April 29, 1940.  The survey indicates the
Section 20 and Section 30 roads were used by the BLM as early as
1934.  These roads follow the same course today as they did in
1934.  Government's Exhibit 1 is a 1940 BLM map depicting the
Ignacio Chavez Grant.  The map shows a road following the same
course as the present-day Banco de la Casa Road.  Exhibit 3-A and
3-B are United States Geological Survey topographic maps.  The
maps indicate the Section 20 and Section 30 roads follow the same
course today as they did in 1961.  On Government's Exhibit 5, the
Banco de la Casa Road is designated as BLM Road 1128 (BLM Road
15N-3W-200).  This designation includes the portions of the road
passing over private property in Sections 20 and 30.  According
to Exhibit 5, BLM Road 1128 is a primitive road maintained by the
BLM.

The BLM has used the Banco de la Casa Road for
administrative purposes since at least 1974.  Bureau of Land
Management agents testified to regularly passing over Byers'
property.  Tony Lutonsky, a cultural resource specialist with the

-4-

BLM, used the road to visit Tapia Canyon, Tower Ruins, Big Bead Mesa, and the Banco de la Casa ruins. He has used the road regularly since 1974. From 1978 until the mid 1980's, he used it on a weekly basis. Until recently, he used the road at least once a year. Mr. Lutonsky also testified to encountering other BLM employees on this road.

It was apparent to Byers the BLM was using the Section 20 and Section 30 roads. Mr. Lutonsky testified Byers' home is located within fifty (50) yards of the road. Mr. Lutonsky further testified that when he used the road, he would often stop to speak with Byers or his parents. The Section 20 gate is visible from Byers' home. Likewise, Byers' home can be seen from the Section 20 gate.

The BLM's use of the roads to access public lands was regular and uninterrupted until the 1980's. At this time, Byers started locking the Section 20 gate. This prevented BLM agents from entering onto the public land in Section 20. Mr. Lutonsky testified the gate was locked intermittently between 1980 and 1984. By 1984 it was locked continuously. Byers would sometimes unlock the gate for the BLM. Often, the BLM was forced to use an alternate route.

In 1993, the BLM advised Byers it needed to use the Section 20 and Section 30 roads to travel to Big Bead Mesa. Byers was advised he could lose his grazing permit if he did not

-5-

cooperate. Byers denied them access. The BLM took an alternate route which passed through Sections 28, 29, and 31. On this route they discovered Byers also locked the gate located between Sections 36 and 35. The lock was removed.

Byers admits locking the Section 20 gate. He also placed a "road closed" sign on the gate. Byers was not authorized by either the BLM or the U.S. Department of the Interior to lock the Section 20 gate, nor did he receive permission to post the sign. The BLM repeatedly warned Byers not to lock the Section 20 gate. He was issued two (2) citations by the BLM for illegally locking the gate. Whenever the BLM discovered the gate was locked, it would promptly remove the lock. Byers, in turn, would relock the gate. This tug-of-war continued for several years.

On January 23, 2001, the BLM received a complaint the Section 20 gate was locked. The next day BLM agents removed the lock. Two days later Byers visited the BLM's field office in Albuquerque. Byers was upset the lock had been removed and informed agents he had re-locked the gate.

The BLM claims they have the right to cross over Byers' property because of their established use of the Banco de la Casa Road (Section 20 and Section 30 roads) and the lack of viable alternate routes. The BLM has, on occasion, asked for permission

-6-

to cross Byers' property. They explained permission was sought in order to prevent an already tense situation from escalating.

The Government filed this action in United States District Court, District of New Mexico, in 1998. The Government is asking the Court to: (1) enjoin Byers' unlawful inclosure of public lands (in violation of 43 U.S.C. § 1061), (2) enjoin Byers from obstructing the passage over public lands (in violation of 43 U.S.C. § 1063), and (3) enjoin Byers from trespassing onto public lands. In addition, the United States seeks a prescriptive easement to cross Byers' property. The Government alleges the BLM has historically used the Banco de la Casa Road to access public lands. According to the United States, the nature and duration of the BLM's use of the Section 20 and Section 30 roads satisfy the requirements for establishing a prescriptive easement under New Mexico law.

Byers admits locking the Section 20 gate but denies it is located on public land. He strongly resists the Government's efforts to establish a prescriptive easement over his property. He claims the Government can use alternate routes to the public lands. Byers' arguments have genesis in recent federal regulations relating to the public lands in Sandoval County. He argues that through these regulations, the Government is trying to create wilderness where none exists. By creating this wilderness, he explains, the Government can preserve public lands

-7-

at the cost of the adjacent landowners who must now sacrifice
their private property so the Government can create access roads.

        The Canoncito Band of the Navajo Tribe (Canoncito or
CBN) intervened as a defendant in this case pursuant to Rule
24(a)(2) of the Federal Rules of Civil Procedure.  The Canoncito
were concerned the Government was attempting to establish a
public road across Byers' property.  They feared public access
would jeopardize the integrity of sacred religious and cultural
sites in the area.  These fears are well-founded as the testimony
indicates several sites sacred to the Canoncito were desecrated
by curious interlopers.  The CBN filed a counter-claim against
the United States and a cross-claim against Byers.  The dispute
between the Canoncito and the Government was settled before
trial.  Therefore, only their cross-claim against Byers is before
the Court.

        The Canoncito seek a prescriptive easement where the
Banco de la Casa Road crosses Byers' property in Sections 20 and
30.  The CBN pass over Byers' property when traveling to Big Bead
Mesa (Big Bead).  In addition, the CBN seek a prescriptive
easement to access the animal offerings petroglyphs at Canon
Tapia.  The petroglyphs and Canon Tapia are located on Byers'
property in Section 20.  The Canoncito engage in traditional
religious ceremonies at the petroglyphs several times a year.
According to the CBN, the nature and duration of their use of the

-8-

road and the petroglyph site satisfy the requirements for
establishing a prescriptive easement under New Mexico law.

The Canoncito consider Big Bead Mesa to be the home of
their ancestors, the "Holy People." Big Bead is located on
public lands in Sections 25 and 26. The Canoncito have engaged
in traditional ceremonies and rituals at Big Bead for more than
one hundred years. One of the most important and largest
ceremonies is held at the beginning of the Navajo New Year in
October. The Canoncito make an annual pilgrimage to Big Bead for
the ceremony.

There are approximately eight hundred original CBN
members. Before 1989, only certain tribal members made the
pilgrimage. In 1989 the pilgrimage was opened to all Canoncito.
Between forty and eighty Canoncito now make the annual
pilgrimage. The CBN have recently invited members of other
tribes, and non-tribal people, to join the pilgrimage. The
pilgrimage is a sacred occasion, and the mood is serious. The
Canoncito do not carry weapons on the pilgrimage, bringing only
the items to be used in prayer and their offerings.

In addition to the annual pilgrimage, a Canoncito
Medicine Man makes up to four trips to Big Bead every year.
Canoncito Medicine Man Orlando Secetaro testified that on these
trips to Big Bead he picks medicine, performs maintenance, makes
offerings, and checks on the petroglyphs. The trips take less

-9-

than forty-eight hours. Mr. Secetaro normally travels alone, but he is sometimes accompanied by up to three assistants.

Today the Canoncito live in a community known as "Tohajiilee," located approximately thirty miles west of Albuquerque and forty miles directly south of Byers' property. To make the pilgrimage to Big Bead, the CBN originally traveled by horseback. Deteriorating roads, fences, and locked gates eventually made this impossible. Since the mid 1980's the Canoncito have driven to Big Bead, using the Banco de la Casa Road. In Sections 20 and 30, the road passes over Byers' property.

Beginning in the late 1980's, Byers began locking both the Section 20 gate and a gate located on his private property. The Canoncito dismantled the gates and continued on their pilgrimage. The Canoncito did not encounter any locked gates in Section 30.

Mr. Secetaro knew he was leading the CBN across Byers' property without permission. The Canoncito were never given express permission to use the Section 20 and Section 30 roads. The Canoncito believe their Holy People give them the right to cross Byers' land on their pilgrimage.

Mr Secetaro has made the pilgrimage to Big Bead since 1974. He testified that his grandfather and father often stopped to speak with Paul Byers and his parents. The Canoncito had an

-10-

amicable relationship with Byers' parents. Paul Byers and the Canoncito also maintained a relatively friendly relationship. Byers exchanged gifts with the Canoncito and had been invited to their campsite. Byers was aware of the CBN's use of the Section 20 and Section 30 roads. On one occasion, Byers provided assistance to Canoncito who experienced automotive problems while traveling across his property.

As Byers' unhappiness with the BLM grew, his behavior became more erratic. The relationship between Byers and the Canoncito began to erode. In 1999, Byers became angry over the large number of non-natives accompanying the CBN on the pilgrimage to Big Bead. Byers tossed a bullet at Mr. Secetaro's feet. He indicated he would rather be shot than allow them to enter his land.

Canoncito leaders decided to temporarily cease using the Banco de la Casa Road to pass over Byers' property. Mr. Secetaro, however, continued to use the road several times a year in order to pick medicine and prepare Big Bead for the October pilgrimage. He would dismantle any fences that blocked his progress.

In addition to the trips to Big Bead, the Canoncito also engage in traditional practices at the animal offerings petroglyphs located in Canon Tapia. The Canoncito visit the petroglyphs four times a year. They enter the canyon by foot,

-11-

walking from their campsite in Section 29 to Tower Ruin, also located in Section 29. Section 29 is public land. From Tower Ruin, the Canoncito continue east on foot to the petroglyph site, which is located on the southwestern corner of Byers' property in Section 20. The canyon floor is used for their ceremonies. The Canoncito also climb the paths and ledges in the canyon wall to view the petroglyphs. The visits to the animal offerings petroglyphs last less than forty-eight hours.

Mr. Secetaro testified he first visited the petroglyph site in 1974. Secetaro's ancestors have visited the petroglyphs for more than one hundred years. The Canoncito were never given express permission to enter Byers' property, nor did they seek permission. Mr. Secetaro testified they were aware the petroglyphs were located on Byers' private property. Delia Secetaro likewise testified she was aware the petroglyphs were located on Byers' property. The Canoncito believe their Holy People give them the right to enter Byers' land. Fences blocking their progress were dismantled, and gates would be opened to permit passage. The mood of the Canoncito visiting the petroglyphs is somber because the event is considered sacred and holy.

The Canoncito's use of the petroglyphs was known to Byers. Byers would see the Canoncito enter his land while he tended cattle. The CBN's campsite and the journey to the

-12-

petroglyph site were both visible from Byers' home.  Byers would also visit the Canoncito at their campsite the night before their pilgrimage to the petroglyphs.

## II.   CONCLUSIONS OF LAW

The Court has subject-matter jurisdiction over the Government's claims pursuant to 28 U.S.C. § 1345 and 43 U.S.C. § 1062.  Jurisdiction is exercised over the Canoncito Band of Navajo's cross-claim pursuant to 28 U.S.C. § 1367.  Venue lies in this District pursuant to 28 U.S.C. § 1391(b).

The Government's second claim alleges Byers unlawfully prevented access to public lands in violation of 43 U.S.C. § 1063.  This statute provides:

> No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct, or shall combine and confederate with others to prevent or obstruct, any person from peaceably entering upon or establishing a settlement or residence on any tract of public land subject to settlement or entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands:  Provided, this section shall not be held to affect the right or title of persons, who have gone upon, improved, or occupied said lands under the land laws of the United States, claiming title thereto, in good faith.

43 U.S.C. § 1063.  To establish that Byers has violated this statute, the Government must demonstrate he:

-13-

    1)     prevented or obstructed . . .
    2)     the entry upon . . . or the free
           passage or transit over or through
         . . .
    3)     the public lands.

The Government has established these elements by clear and convincing evidence. At trial, Byers admitted locking the Section 20 gate. He further acknowledged that he did not have the BLM's permission to do this. Byers was asked repeatedly not to lock this gate. He was even issued two citations. By locking the gate, Byers prevented the BLM from entering upon the public land in Section 20. In addition, the locked gate prevented the BLM from using the Banco de la Casa Road to access distant public lands.

Byers admits locking the Section 20 gate but argues it is not located on public land. His argument that the fence and gate are not located on public land but, rather, are located on part of a "Spanish land grant," is without merit. The evidence demonstrates the Section 20 gate is located entirely on public land. The Court bases this conclusion on United States Geological Survey maps of Sandoval County. Byers' property begins approximately one-quarter mile south of the Section 20 gate.

Pursuant to 28 U.S.C. § 1062, the Court may enter an injunction to restrain violations of Chapter 25. See 28 U.S.C.

§ 1062; and *Camfield v. United States*, 17 S.Ct. 864, 167 U.S.
518, 42 L.Ed. 260 (1897).  Having determined Byers violated
Section 1063 of Chapter 25 (28 U.S.C. § 1063), the Court will
enjoin Byers from locking the Section 20 gate.  Byers will be
ordered to remove the lock and sign he placed on the Section 20
gate and to refrain from blocking, obstructing, or otherwise
impeding access to public lands.

Because Byers will be ordered to remove the lock and
sign and is further enjoined from interfering with access to the
public lands at issue, the Court need not address the
Government's claims Byers unlawfully inclosed public lands in
violation of § 1061 and unlawfully trespassed on public lands.
These claims will be dismissed as moot.  Remaining, however, are
the Government's and Canoncito's claims under New Mexico law to
establish a prescriptive easement where the Banco de la Casa Road
passes over Byers' property in Sections 20 and 30.

The Government can acquire prescriptive rights in
privately owned property.  *United States v. Stubbs*, 776 F.2d 1472
(10th Cir. 1985).  Whether the BLM has established a prescriptive
easement to cross over Byers' property is a question of New
Mexico law.  *Block v. North Dakota ex rel. Board of University
and School Lands*, 461 U.S. 273, 292 fn. 25, 103 S.Ct. 1811, 1822
75 L.Ed.2d 840.  Likewise, whether the Canoncito have established
a prescriptive easement also presents a question of New Mexico

law.  See *U.S. on Behalf of Zuni Tribe of New Mexico v. Platt*, 730 F.Supp. 318, 321-24 (D.Ariz. 1990).

To establish a prescriptive easement under New Mexico law, the BLM and Canoncito must each demonstrate their use of the Banco de la Casa road over Byers' property in Sections 20 and 30 was:

1)   open and notorious,
2)   uninterrupted,
3)   peaceable,
4)   adverse,
5)   under a claim of right,
6)   and continued in the aforementioned manner for a period of ten years with the knowledge or imputed knowledge of the owner.

*Hester v. Sawyers*, 71 P.2d 646, 651 (N.M. 1937); *Silverstein v. Byers*, 845 P.2d 839, 841 (N.M.Ct.App. 1993); *Maloney v. Wreyford*, 804 P.2d 412, 415 (N.M.Ct.App. 1990).  These elements must be established by clear and convincing evidence.  *Cox v. Hanlen*, 953 P.2d 294, 302 (N.M.Ct.App. 1998).  If Byers can demonstrate the use of the road was permissive, a prescriptive easement cannot be established.  *Hester*, at 651; *Scholes v. Post Office Canyon Ranch, Inc.*, 852 P.2d 683, 684-85 (N.M.Ct.App. 1992).

Byers did not contest the use of the road by the BLM and Canoncito was open and notorious, uninterrupted, peaceable, and continuous for the statutory period.  The Government and CBN also provided sufficient evidence at trial to satisfy these requirements.  Each element will be discussed in turn.

-16-

**Open and notorious**

"To be open and notorious, the use must be of such a nature as to charge the landowners with constructive notice." *Silverstein*, 845 P.2d at 842.  The BLM and Canoncito do not need to demonstrate the defendant had actual notice of their intent to acquire a prescriptive easement over his property.  *Id.*

The evidence at trial indicates the BLM's and Canoncito's use of the road was open and notorious for the ten-year statutory period.  Byers has lived in Section 20 since 1977. He admits knowing of the BLM's and Canoncito's use of the road prior to, and after, his acquisition of the property in Sections 20 and 30.  The Banco de la Casa Road is the only reasonable means of ingress and egress to the distant public lands and Big Bead Mesa.

The Canoncito's use of the animal offerings petroglyphs was also open and notorious.  Byers admits knowing the Canoncito used the petroglyph site several times a year.  The nature of the BLM's and Canoncito's entry on Byers' property put defendant on constructive notice of their intent to acquire prescriptive easements.

**Uninterrupted**

The requirement the use be "uninterrupted" is not the same as the requirement the use be "continuous."  *Maloney*, 804 P.2d at 415.  "The term 'uninterrupted' deals with the behavior

-17-

of the potential servient owner of the prescriptive easement."
*Id.*

Both the BLM and Canoncito demonstrated their use of
the road was uninterrupted for the ten-year statutory period.
The BLM used the road regularly from 1934 until Byers denied them
access in 1993. Likewise, the Canoncito's use of the road was
uninterrupted from at least 1974 until 1997. The evidence
indicates the Canoncito have visited the animal offerings
petroglyphs for hundreds of years. These visits have never been
interrupted.

### Peaceable

The Canoncito demonstrated their use of the road and
petroglyphs was peaceable for the statutory period. Mr. Secetaro
explained the Canoncito carry no weapons on their pilgrimages to
Big Bead and the petroglyphs. The CBN believe they are protected
from harm by their Holy People. The peaceable nature of the
Canoncito's entry is further supported by their decision to
temporarily use an alternate route to Big Bead following the
incident when Byers tossed a bullet at Mr. Secetaro's feet.

Whether the Government's use was peaceable presents a
more difficult question. Mr. Lutonsky testified that in 1993
Byers was threatened with the loss of his grazing permit if he
did not allow the BLM to cross over his land. This incident,
standing alone, does not mean the Government's use of the road

-18-

was not peaceable.  The evidence indicate the BLM's use was
peaceable at its inception and continued to be peaceable up to
the time the difficulties with Byers arose in 1993.  The BLM has
made every effort to resolve this dispute as amicably as
possible.  The evidence, therefore, establishes the Government's
use of the road over Byers' property was peaceable for the
statutory period.

### Continuous for the ten-year statutory period

The evidence establishes the BLM's and Canoncito's use
of the Banco de la Casa Road, and the Canoncito's use of the
animal offerings petroglyphs, far exceeds the ten years necessary
to establish a prescriptive easement under New Mexico law.
The BLM demonstrated it has used the road for administrative
purposes on a continuous basis since 1934.  The road consistently
appears on BLM maps, and agents testified to using the road to
pass over Byers' property several time a year.  Only recently has
their use of the road been frustrated.

The Canoncito demonstrated they used the road
continuously from 1974 to 1999.  Mr. Secetaro testified that in
addition to the annual pilgrimage, he has used the road to travel
to Big Bead Mesa four times a year since 1974.  The Canoncito
also demonstrated they have continuously visited the animal
offerings petroglyphs for more than sixty-eight years.  Delia
Secetaro is sixty-eight years old and is a member of the

-19-

Canoncito Band of the Navajo Tribe.  Through a Navajo
interpreter, she testified her mother and grandmother told her
stories of their own visits to Big Bead Mesa and the petroglyphs.
Their visits occurred long before Ms. Secetaro was born.

**Adverse and Under a Claim of Right**

According to New Mexico law, when the party seeking to
establish a prescriptive easement has demonstrated their use was
open and notorious, uninterrupted, peaceable, and continuous for
the statutory period, the use is presumed to be adverse and under
a claim of right.  *Sanchez v. Dale Bellamah Homes of New Mexico,
Inc.*, 417 P.2d 25, 28 (N.M. 1996).  The BLM and Canoncito have
demonstrated their uses were open and notorious, uninterrupted,
peaceable, and continuous for the statutory period, and the Court
will presume the uses were adverse and under a claim of right
unless Byers can demonstrate the presumption does not apply.
*Scholes*, 852 P.2d at 684-85.  He can satisfy this burden by
producing evidence the "claimed right of way traverses large
bodies of open, unenclosed, and sparsely-populated private land."
*Village of Captan v. Kaywood*, 632 P.2d 1162, 1163 (N.M. 1981).

The evidence establishes that Byers and other
landowners maintain fences and gates throughout much of the area.
In regard to the animal offerings petroglyphs, the evidence
establishes that the Canoncito encountered a fence when entering
Byers' property.  If the defendant cannot establish the claimed

-20-

right-of-way passes over large bodies of open, unenclosed, and sparsely populated private land, he must come forth with evidence that express permission was given to use the right-of way at issue. *Scholes*, 852 P.2d at 684.

Byers maintains that the BLM's and CBN's use of the road, and the Canoncito's entry on his property, was permissive. However, the evidence establishes that the easements claimed by the BLM and Canoncito were established at least as far back as the 1930's or 1940's. There is no evidence the BLM sought, or was given, express permission to traverse over Byers' property from 1934 to 1993. There is also no evidence the Canoncito ever sought, or were given, express permission to use the road to cross Byers' property or conduct ceremonies at the petroglyphs.

Byers argues his grazing permit gives the BLM permission to cross his property. The grazing permit, originally issued to Mr. Griego and subsequently assigned to Byers, gives the BLM and their permittees permission to enter the *public lands* for various administrative purposes. The permit does not give the BLM permission to enter Byers *private property* in Sections 20 and 30. Therefore, Byers' argument the grazing permit amounts to evidence of express permission fails. The Court finds the evidence establishes the BLM's and Canoncito's claimed uses are adverse and under a claim of right.

-21-

To summarize, the BLM and Canoncito have established a prescriptive easement over Byers' property under New Mexico law. The BLM's use of the Banco de la Casa Road to cross Byers' property in Sections 20 and 30 was open and notorious, uninterrupted, peaceable, adverse and under a claim of right. They used the road for administrative purposes continuously for the ten-year statutory period.  The Canoncito established their use of the road to cross Byers' property in Sections 20 and 30, and their use of the animal offerings petroglyphs in Section 20, were open and notorious, uninterrupted, peaceable, adverse, under a claim of right, and continuous for the statutory period.  The Court will order the BLM and Canoncito be granted easements consistent with the limitations that shall now be set forth.

### III.   SCOPE OF THE EASEMENTS

The Court must next determine the scope of the easements.  *Cunningham v. Otero County Electric Cooperative*, 845 P.2d 833 (N.M.Ct.App. 1992).  "[T]he character and extent of prescriptive easements are determined by the use under which the easement[s] [were] acquired."  *Maloney*, 804 P.2d at 416. Accordingly, the Court will look to the trial testimony and exhibits to establish the scope of the BLM's and Canoncito's easements.  *Id.*

-22-

### Scope of the BLM easement

The BLM used the road for ingress and egress to distant public lands. Their use of the road ranged from daily to monthly. The course of the Section 20 and Section 30 roads is established in Government's Exhibit 10, a copy of which is attached to this opinion. Trial testimony indicates the road is twelve feet wide and unpaved, accommodating a single lane of vehicular traffic.

At trial, the BLM argued its "permittees" should also have access to the easement. The Court rejects this argument for two reasons. First, the claim is not supported by the evidence. The Court received no evidence BLM permittees used the Banco de la Casa Road. There was also no evidence regarding what, if any, standard the BLM uses to determine who is allowed to access public lands. Second, the Court is concerned the BLM would have virtually unfettered discretion as to who could use the road. According to the BLM, a "permittee" is anyone who has its permission to enter, or use, public lands. Allowing permittees to use the easement, in effect, creates a public right-of-way across Byers' property because the BLM could simply give *everyone* permission to access the public lands in Sandoval County. Though the issue was raised in the pre-trial order, the Government did not argue at trial that the Banco de la Casa Road was a public road. Furthermore, the evidence is insufficient to establish a

-23-

public easement over Byers' property.  See *Trigg v. Allemand*, 619
P.2d 573 (N.M.Ct.App. 1980)(addressing the requirements for
establishing a public right-of-way).

      The Court will not extend the scope of the easement to
include BLM permittees.  Only the Department of Interior Bureau
of Land Management acquired a prescriptive easement across Byers'
property.  If the Government is determined to establish access
for its permittees, it can initiate a condemnation proceeding.
See *Leo Sheep Company v. United States*, 440 U.S. 668, 680, 99
S.Ct. 1403, 1460, 59 L.Ed.2d 677 (1979).

### Scope of the Canoncito easements

      The Canoncito use the Banco de la Casa Road to travel
to Big Bead Mesa several times a year.  They travel the road by
car or truck.  Trial testimony establishes the road is twelve
feet wide and unpaved, accommodating only a single lane of
traffic.  The course of their prescriptive easement across Byers'
property is established in Canoncito Exhibit A, a copy of which
is attached to this opinion.

      Canoncito Medicine Men travel to Big Bead several times
a year.  On these trips, medicine is collected, offerings and
prayers are made, and the area is prepared for the pilgrimage.
The medicine man may be accompanied by people assisting him.

      The testimony further established that no more than one
hundred Canoncito make the pilgrimage to Big Bead.  According to

-24-

Mr. Secetaro's testimony, the Canoncito have only recently
invited guests on the pilgrimage.  The guests include tribal and
non-tribal people.  He also testified Mr. Byers became upset
after discovering non-Canoncito were crossing his land.  The
Court is sensitive to Byers' concerns.  The easement over Byers'
property will extend to members of the Canoncito tribe and their
guests.  However, no more than one hundred people will be
permitted to pass over Byers' property.

          The Canoncito have also acquired a prescriptive
easement to enter Byers' property to engage in traditional
practices at the animal offerings petroglyphs.  The Canoncito
make the journey to the petroglyphs from their campsite,
traveling by horseback or on foot.  The Canoncito visit the
petroglyphs several times a year.  The location of the animal
offerings easement is established in Canoncito Exhibit A.
Exhibit A indicates the easement extends over and across the path
through Canon Tapia, beginning at the southernmost portion of
Byers' property in section 20.  The easement extends to the
northern edge of the animal offerings petroglyphs.  It includes
the ledges and paths in the canyon's wall and the canyon floor.

## IV.   SUMMARY

          The Government has established the defendant, Paul
Byers, violated 43 U.S.C. § 1063.  Byers will be enjoined from
locking the Section 20 gate.  He will also be ordered to refrain

from locking gates located on public land.  Byers can only lock these gates if he receives express permission from the United States Department of the Interior.  The Government's other claims will be dismissed as moot.  The Government will be granted a prescriptive easement where the Banco de la Casa Road passes over Byers' property in Sections 20 and 30.  The easement does not extend to BLM permittees.

The Canoncito Band of the Navajo Tribe will be granted two prescriptive easements.  First, the Canoncito will be granted a prescriptive easement where the Banco de la Casa Road passes over Byers' property in Sections 20 and 30.  Second, the Canoncito will be granted a prescriptive easement to enter Byers' property in Section 20 and conduct traditional ceremonies at the animal offerings petroglyphs.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 26th day of March, 2001.

BY THE COURT:

LYLE E. STROM, Senior Judge
United States District Court

-26-

# THE EXHIBIT ATTACHED TO THE PLEADING IN THIS CASE CANNOT BE SCANNED.  THE EXHIBIT IS ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE LOCATED IN THE RECORDS DEPARTMENT U.S. DISTRICT COURT CLERK'S OFFICE